IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2016

**STATE OF TENNESSEE v. JERRY WILLIAMS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-06250      J. Robert Carter, Jr., Judge**

_____

**No. W2015-01981-CCA-R3-CD  -  Filed August 31, 2016**

_____

A Shelby County jury convicted the Defendant, Jerry Williams, of  aggravated burglary and vandalism over $10,000, and the trial court sentenced the Defendant to four years of supervised probation for each count.  On appeal, the Defendant contends that the trial court erred when it limited his cross-examination of the victim and that the evidence is insufficient to sustain his convictions.  After review, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Glover Wright and Robert Felkner, Assistant Public Defenders (at trial), Memphis, Tennessee, for the appellant, Jerry Williams.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; Meghan Fowler and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from a home invasion that occurred on October 19, 2013, during which the victim's house and personal property contained therein were severely damaged. For this offense, a Shelby County grand jury indicted the Defendant, the victim's boyfriend, for aggravated burglary and vandalism. At his trial on these offenses, the parties presented the following evidence: The victim, Barbara Dodson, testified that she had known the Defendant for eight years during which time they intermittently dated. The Defendant, who was a truck driver, lived with her when he was not on the road. The Defendant had moved into her home in June 2013 and paid her $300 per month to help with the bills. During one of the Defendant's work trips, he did not return the victim's phone calls, and she concluded that she wanted to end their relationship. The Defendant came to her home on October 13, 2013, and the two engaged in a "big argument." The Defendant told her that he would leave if she returned $200 of the $300 he had given her at the first of the month for bills. The victim told the Defendant to leave her home and that she was not going to give him any of the money back because she did not have it since she spent it on bills. The Defendant told her that he was going to "'F' [her] up" if she did not pay him. The Defendant told her that he was leaving to go get his gun and that he was going to shoot whoever walked in the front door of the home.

The victim testified that, when the Defendant left, she called her daughter and then the police. After calling the police, the victim left her home and spent the night at her daughter's house. The victim said that, when she returned to her home the following day, she placed an iron bar by her bed to protect herself. She and the Defendant both had keys to her home.

The victim recalled that on October 19, 2013, she was at the hospital all day for the birth of her great grandchild. She left her house at around 9:30 or 10:00 a.m., and her son-in-law drove her home at around 6:00 or 6:30 p.m. As she got out of the car, her son-in-law noticed that her back, wooden door had been "kicked in" and told her to get back into the car. The locked security door, to which the Defendant had a key, was undamaged, but the wooden door was damaged. The victim said she called the police, and she waited outside until they arrived.

The victim said that, when police arrived, they entered her home but asked her to remain outside. When they allowed her in a couple of hours later, the smell of bleach was so strong that she could not stay in the home for long. Additionally, there was "glass everywhere." The victim said that her house was destroyed. She said that both the furniture and her dishes had been thrown on the floor and "cut up." The smell of bleach emanated from her carpet, clothing, and shoes. The bleach bottles were still in her home, and her clothing had rotted from being covered with bleach. The victim said that her glass coffee table was turned upside down. Her living room chairs had been cut with a knife and her curio and china cabinets had been knocked over. The victim said that the

china that she had been collecting since 1967 had all been destroyed. Her dishwasher and oven doors were broken, and she had to replace her cabinet drawers and microwave. Bleach had been poured all over the clothing and shoes in her closet. The victim identified several photographs of her home in this state, which the State showed to the jury.

The victim testified that her expensive jewelry had not been taken. Further, the car in her garage was undamaged. She noted that nothing of value had been taken from the home. The victim noted that the items belonging to the Defendant that remained at her home were also undamaged.

The victim testified that the damage to her home and possessions totaled almost $50,000, and she had to sleep in a hotel for a month. Because of her insurance claim to recover this amount, her insurance company had terminated her coverage. Additionally, her mortgage had increased because her insurance premium had increased. The victim said that she had not been able to replace some of the items that were damaged, like her china angels and dishes. The victim said that she no longer felt safe in her home because she feared the Defendant.

During cross-examination, the victim agreed that she was married to another man at the time of her relationship with the Defendant and that she and her husband did not divorce until 2013. The victim said that she decided in October 2013 to end her relationship with the Defendant for several reasons. The victim agreed that, while the Defendant threatened to hurt her and her children, he never physically assaulted her. She agreed that she had never seen the Defendant with a gun but that he had told her on previous occasions that he owned a gun. After she asked the Defendant to leave, the victim never saw him return nor did she receive any phone calls that she could identify as coming from him.

The victim testified that during the week between October 13 and when her house was damaged on October 19, the victim packed the Defendant's belongings into one of the Defendant's vehicles, which he had parked at her home. She called the Defendant's mother and told her to have the Defendant come and get his car with his belongings. The Defendant's mother told her to pay the Defendant $200 or he was going to "do something."

The victim identified specific line items on her insurance claim and defended the value she placed upon them. She agreed that she did not have receipts showing the amount that she paid for these items. She agreed that the total value of the damaged items in her home on her insurance claim was $28,924.04.

The victim said that her son and son-in-law changed the locks to the doors of her home on October 14, the day after she asked the Defendant to move out. They were unable to change the locks on the storm door.

Ulysses Dalton testified that the insurance company that he worked for paid $42,596.98 to the victim because of the damage to her home and personal belongings. He offered the documentation detailing this transaction. During cross-examination, Mr. Dalton testified that $6,671.00 of that amount reimbursed the victim for expenses that she incurred when she was displaced from her home. He also agreed that there existed a $3,000.00 discrepancy in one portion of the document.

Laura Nolen, the victim's daughter, testified that she picked up her mother and took her to the hospital on October 19, 2013, for the birth of Nolen's grandchild. When Ms. Nolen and her husband brought the victim home that evening, Ms. Nolen noticed that the door to the home was open. Ms. Nolen said that her husband told the victim not to go into the home and to call the police. After the police came, Ms. Nolen went into the home and saw that it was "[d]estroyed." Ms. Nolen testified that the victim's angel collection and china were both destroyed. Ms. Nolen confirmed that Ms. Nolen's husband and her brother changed the locks to the victim's home after the victim asked the Defendant to move out.

Rex Paulson, the victim's neighbor, testified that he lived two houses away from the victim but did not know her at the time of this crime. He said that on October 19, 2013, he was outside on his back porch when he saw the Defendant, whom he later identified from a photographic lineup, parked at the victim's house. Mr. Paulson stated that, on that day, the Defendant could not start his vehicle, and he asked for Mr. Paulson's help. Mr. Paulson tried to "push" off the Defendant's vehicle. After no success, Mr. Paulson used his truck's battery to jump-start the Defendant's vehicle.

Mr. Paulson expressed certainty about the date because he recalled that it was a Saturday and also his step-daughter's birthday. He recalled that he saw the police respond to the victim's house and asked a police officer what had happened. The police officer told him about the incident, and Mr. Paulson told police officers that he had assisted someone in jump-starting their car parked at the victim's house earlier that day.

During cross-examination, Mr. Paulson testified that he helped the Defendant at around 11:30 a.m. He said that he never saw the Defendant enter or leave the victim's house. He said that the Defendant's vehicle was "stuffed pretty full" with some Glad bags and a lampshade. Mr. Paulson said that, from the time that he first saw the Defendant to when the Defendant drove away was between fifteen and twenty minutes in duration. Mr. Paulson testified that he never heard the sound of a door breaking and that,

4

when he saw him, the Defendant did not appear agitated or angry. He also did not notice the smell of bleach on the Defendant.

Bruce Boaz, a deputy with the Shelby County Sheriff's Office, testified that he responded to the call about the damage to the victim's home on October 19, 2013. He said that he was the first officer on the scene and that he noted upon entering the home that there was "a fair amount of destruction." He immediately smelled bleach and observed bleach bottles on the floor. The officer found it odd that there was no damage to the security door but that the wooden door was kicked in. Deputy Boaz testified that the damage to the home looked "personal" and that nothing had been stolen.

Joshua Todd Lineberry, a deputy with the Shelby County Sheriff's Office, testified that he responded to a domestic violence call from the victim's residence on October 13, 2013. When he arrived at the scene, he spoke with the victim, whom he found "very emotional." During cross-examination, Deputy Lineberry testified that the Defendant was not present when he arrived at the victim's home.

For the Defendant, his mother, Marie Williams, testified that the victim called her on October 18, 2013, and, after speaking with the victim, she went with the Defendant to the victim's house to pick up items belonging to the Defendant. Ms. Williams said that, when she arrived, she saw that the Defendant's belongings were in his car parked at the victim's house. She helped the Defendant move some of his things into her car. She then left and went home, and the Defendant, who drove separately, remained at the home. Ms. Williams said that, while she left before the Defendant, he was at her home when she arrived back there.

The Defendant testified and confirmed that he and the victim were in an intermittent romantic relationship over the course of eight years. The Defendant recalled that their relationship became "rocky" in July 2013 because he suggested the manner in which the victim should spend her inheritance from her mother's passing. Because of the arguing, on the rare occasions that the Defendant was home, he slept in the back bedroom. From that point forward, he viewed their relationship as that of a "roommate situation" rather than a romantic relationship.

The Defendant testified that, in October 2013, he was in Nashville for several days, and the victim repeatedly called him. He assumed she wanted money, so he did not answer her calls. When he returned home, the victim asked him for $200. He said that he had already given her $500 for rent, so he did not want to give her an additional $200. He said that he left and went to Walls, Mississippi. He returned early Saturday morning on October 19, 2013. The Defendant said that he dropped off his truck and went to his mother's house. He laid down and then received a phone message saying that he needed

5

to get his car from the victim's house. He and his mother went to the victim's house at around 10:00 a.m. When he arrived at the victim's house, he saw that all of his things, including a barbecue grill and tools, were located in his car. The back window of the vehicle, a GEO tracker, was torn out. The Defendant and his mother removed enough of his possessions from the Tracker to his mother's car so that he could drive the Tracker. The Defendant's mother then got into her car and drove away. At that point, the Defendant realized that his car battery was dead. He obtained assistance from a neighbor to start the Tracker, and he traveled directly to his mother's house. The Defendant said that he was only at the victim's house for a maximum of fifteen minutes.

Based upon this evidence, the jury convicted the Defendant of aggravated burglary and vandalism over $10,000. The trial court sentenced the Defendant to concurrent sentences of four years of supervised probation for each count. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it limited his cross-examination of the victim and that the evidence is insufficient to sustain his convictions.

## A. Cross-Examination

The Defendant contends that the trial court erred when it limited his cross-examination of the victim by not allowing him to ask about the victim's financial condition. He asserts that he wanted to prove that the victim relied upon him financially, giving her a motive to lie about his committing the vandalism and burglary. The State counters that the trial court properly ruled that the victim's finances were irrelevant. We agree with the State.

During the trial, the Defendant asked the victim about the compensation she received from the insurance company for the damage to her home. He then attempted to ask her about her disability income. The State objected. The Defendant argued that this evidence would go to the victim's credibility and show she had a motive to lie about the Defendant committing these crimes. The trial court ruled that this evidence was not relevant.

The Defendant couches his argument in terms of his right to confront his accuser. A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840

S.W.2d 317, 332 (Tenn. 1992). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *see Coffee v. State*, 188 Tenn. 1, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This Court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *see State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460, 466 (Tenn. 1963).

The Tennessee Rules of Evidence define the scope of cross-examination. Rule 611(b) says, "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility, except as provided in paragraph (d) of this rule," with paragraph (d) limiting the scope of cross-examination when a party calls an adverse witness. Tenn. R. Evid. 611(b). In addition, Rule 616 states, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. "A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001).

The defendant's right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. Tenn. R. Evid. 401, 402 (providing that "evidence which is not relevant is not admissible"); *see Monts v. State*, 379 S.W.2d 34, 40 (Tenn. 1964); *see also State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994); *State v. Rhoden*, 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987); *State v. Braggs*, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980); *Taylor v. State*, 551 S.W.2d 331, 335 (Tenn. Crim. App. 1976). The term "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In short, evidence is relevant if it tends to prove a material issue. Tenn. R. Evid. 401, *Advisory Comm'n Cmts*. There are further limitations on the relevant evidence that the defendant may elicit during cross-examination of a witness. Tennessee Rule of Evidence 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This Court will not disturb the limits that a trial

court has placed upon cross-examination unless the court has unreasonably restricted the right. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001).

In the case under submission, the trial court found that the amount of the victim's disability income was not relevant because it did not tend to prove a material fact, including whether the victim was credible. We agree. The fact that the victim received disability income did not show that she was more likely to lie about the facts leading to the burglary and vandalism. Her financial situation did not make her more likely to lie about the Defendant's actions. She reported threats that the Defendant made to her almost a week before the burglary. Further, the Defendant cross-examined her about the fact that she was upset that he was no longer going to be paying her rent and that she did not have the money to pay him back the rent he had already paid for October. We conclude that the trial court did not abuse its discretion when it limited the Defendant's further questioning about the victim's receipt of disability income. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain his convictions. He states that, while there was evidence that the victim's home and property were damaged, there is insufficient proof that he committed the offenses. The State counters that the evidence established that the Defendant committed these offenses.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v.*

8

*Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In the case under submission, the Defendant does not contend that the evidence is insufficient to support the elements of the convictions but that the State did not prove his identity as the perpetrator of these crimes. In any case, the identity of the perpetrator is an essential element of any crime, and therefore the State must prove it beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). We would also note that issues of identity and credibility are classic jury questions. *State v. Lance Murray*, No. W2009-

9

00332-CCA-R3-CD, 2010 WL 1006720, at *6 (Tenn. Crim. App., at Jackson, Mar. 19, 2010) (citing *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*), *no Tenn. R. App. P. 11 application filed*.

We conclude that a rational jury could have reasonably inferred that the Defendant committed these crimes. The Defendant and the victim went through a break-up six days before the burglary. The two had a dispute about money, with the Defendant requesting that the victim pay him $200 and threatening her and stating that she would be sorry if she did not do so. The victim called the police and reported the Defendant's behavior. In part because the Defendant had keys to her home, the victim's son and son-in-law came to her home to change her locks. They successfully changed the locks to her wood doors but had to order the part to change the locks on her storm/security door. On the day of this burglary, the victim locked all of her doors, both the exterior storm/security doors and the wooden doors. She then left and went to the hospital for the birth of her great-grandchild.

On the day of the burglary, while the victim was at the hospital, the Defendant came to the victim's home to retrieve his personal property, which he found densely packed into his car. The Defendant was unable to start his car, and the victim's neighbor came to help him "jump" the car's battery.

When the victim returned home from the hospital, driven by her daughter and son-in-law, she noted that, while the exterior storm door was intact, the wood door to her home had been kicked in. She called the police who entered her home and found it severely damaged. None of the victim's jewelry or any of her electronics had been taken. Much of her personal property, however, was destroyed either by being broken, slashed with a knife, or doused with bleach. The victim's insurance paid her $42,596.98 as compensation to repair damages to her home, replace personal property, and for her loss of the use of her home due to the vandalism.

We conclude that this evidence sufficiently established the Defendant's identity as the perpetrator of these offenses. By all accounts, he was the only one other than the victim with a key to her storm/security door, he was present at her house the day of the burglary, and he had previously threatened the victim if she did not repay him money. It was within the jury's providence to infer from the evidence that the Defendant had committed these offenses. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Defendant is not entitled to relief.  As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE